This case was heard before Deputy Commissioner Martha W. Lowrance in Morganton on 17 January 1997, and in Asheville on 5 February 1997. Subsequent to the hearings, the case was reassigned to Deputy Commissioner W. Bain Jones, Jr., for a final decision. The depositions of Drs. William D. Lyday, A. Gregory Rosenfeld, Dennis L. Hill, Andrea A. Stutesman, and Ronald C. Demas were taken and submitted as evidence.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as
 STIPULATIONS
1. All parties hereto are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Hartford Accident and Indemnity Company is the workers compensation insurance carrier on the risk.
4. The parties stipulate to all medical and vocational records, subject to corroboration by deposition.
5. Pursuant to various I.C. Form 21 and Form 26 Agreements for payment of compensation, the parties stipulate that:
(a) Plaintiff sustained an injury by accident arising out of and in the course of her employment on 12 April 1995;
(b) Plaintiffs disability from said injury by accident began on 16 May 1995; and
(c) Defendants paid temporary total disability benefits to plaintiff from 16 May 1995, to 7 June 1995. Pursuant to an I.C. Form 21 dated 20 May 1995 and executed 7 June 1995, defendants paid an additional two weeks of temporary total disability benefits to plaintiff from 12 June to 25 June 1995. Pursuant to an I.C. Form 26 Agreement approved on 16 May 1996, defendants began paying to plaintiff temporary total disability benefits beginning 20 December 1995, and continuing to the present. 6. In addition, the parties have offered into evidence the following medical records:
a. Burke Rehabilitation Center (20 pp.)
b. Frye Regional Medical Center (12 pp.)
c. Carolina Hand Surgery Assoc., P.A. (8 pp.)
d. S. Andrew Deekens, Jr., M.D. (2 pp.)
e. Allen O. Smith, M.D. (15 pp.)
f. A. Gregory Rosenfeld, M.D. (20 pp.)
g. Drexel Medical Practice (11 pp.)
h. Gamewell Chiropractic Center (1 p.)
i. J. Alfred Moretz, M.D. (4 pp.)
j. Rehabilitation DSpecialists (8 pp.)
k. Counseling Psychology Resources (3 pp.)
l. Grace Hospital — Laboratory (1 p.)
m. Sports Occupational Rehabilitation Center (18 pp.)
n. William D. Lyday, M.D. (5 pp.)
o. CRA Managed Care, Inc. (171 pp.)
***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is married, the mother of two children and was born on 23 June 1962.
2. Plaintiff was employed by defendant-employer on 9 February 1995 as a machinist. Her job consisted of sliding a basket of thirty pound (30 lb.) tubes down a conveyor line, then one by one, lifting the tubes out of the basket and inserting them into a lathe, then into a grinder, then back into the basket. Plaintiff would run approximately two to three hundred tubes in a shift.
3. On 12 April 1995, plaintiff was moving a basket containing 10 to 20 tubes weighing about thirty pounds (30 lbs.) each. She had to "pull and tug the basket to get it around a ninety degree corner turn. While pulling and tugging the basket with her left hand and arm to get it through the corner turn, plaintiff felt a sharp pain in her left elbow. Plaintiff reported her injury, but did not leave work.
4. During the next forty-eight hours, plaintiffs pain radiated to her left wrist and fingers. Within approximately one week, the pain had spread into her left shoulder. Plaintiff experienced a dull, numbing, tingling pain in her left arm and shoulder, and noted a loss of strength in her left hand and arm.
5. Plaintiff was treated by Dr. S. Andrew Deekens Jr. on the date of the accident. Dr. Deekens referred plaintiff to Dr. Allen O. Smith, a neurologist. Dr. Smith diagnosed plaintiff with a "spraining, stretching sort of injury to her left arm.
6. Plaintiff continued to perform her job until 16 May 1995 when she was written out of work by Dr. Smith due to continuing pain in her left arm. On 6 June 1995 Dr. Smith released plaintiff to return to light duty work. Plaintiff was placed on a job where she was required to use her arms to pick up several thousand items per shift, weighing two to fifteen pounds and check them for cracks. Due to the repetitive motion involved, this job irritated plaintiffs left injured arm. Defendant-employer then placed plaintiff on a bathroom cleaning crew where she was assigned to work with students, cleaning toilets, floors, sinks and walls. She was also required to empty trash cans, stock the bathroom, clean offices and mop. The job required plaintiff to use her arms overhead when cleaning walls and bathroom stalls.
7. On 20 June 1995 plaintiff sought treatment from Dr. Ronald J. Neimkin. Dr. Neimkins impression after examination was that plaintiff might have "some thoracic outlet or a possible brachioplexus pull injury. Dr. Neimkin prescribed Relafen and recommended thoracic outlet exercises. He restricted plaintiffs weight lifting to three pounds with no use of her hands above her head. On 1 August 1995, Dr. Neimkin was of the impression that plaintiff had cubital tunnel syndrome and thoracic outlet syndrome. Dr. Neimkin continued to treat plaintiff through 19 October 1995. Thereafter, defendants transferred plaintiffs care and treatment to Dr. A. Gregory Rosenfeld, a neurosurgeon.
8. Plaintiff was terminated from her employment on 7 July 1995. The official reason given for her termination was that plaintiff did not possess the "Dana attitude. Plaintiff had not received any previous reprimands. At the time of plaintiffs termination, defendant-employers Human Resource Manager, Wilma Taylor, and plaintiff disagreed on the type of duties plaintiff was able to perform as a result of her injuries. Wilma Taylor told plaintiff that her weight lifting restriction was 31 pounds; plaintiff said her restriction was three pounds and that she could not wipe overhead walls. Plaintiff was correct as Dr. Neimkin had restricted her from lifting more than three pounds and from working with her hands in overhead positions.
9. Plaintiff was fired for causes related to her work-related injury and not for misconduct or fault on her part. No weight is accorded to the testimony of defendant-employer that plaintiff was fired for insubordination.
10. On 14 August 1995 (after plaintiff was terminated), an I.C. Form 21 was filed with the Industrial Commission in which defendant stipulated that plaintiff sustained a compensable injury on 12 April 1995 and further agreed to pay plaintiff compensation at a rate of $329.44 beginning 16 May 1995 and continuing for necessary weeks. Plaintiff was paid temporary total disability compensation from 16 May 1995 to 7 June 1995 and from 12 June 1995 to 25 June 1995.
11. Plaintiff received no compensation benefits between her termination on 7 July 1995 and 20 December 1995, the date she underwent surgery. On 14 May 1996 defendant filed an I.C. Form 28 "Return to Work Report which erroneously reported that plaintiff returned to work on 26 June 1995 at the same wages. The "Return to Work Report further noted that plaintiff became totally disabled again on 20 December 1995 due to surgery. Defendant also filed on 14 May 1996 an I.C. Form 26 rev. "Supplemental Agreement as to Payment of Compensation Pursuant to N.C. Gen. Stat. 97-82 with the Commission, wherein defendant stipulated that plaintiff became totally disabled on 20 December 1995, and agreed to pay temporary total disability compensation at the same rate of $329.44 beginning on 20 December 1995 and continuing for necessary weeks.
12. On 28 November 1995, plaintiff presented to neurosurgeon, Dr. A. Gregory Rosenfeld, complaining of "constant, dull, achy neck, left paraspinous and left upper-extremity discomfort — particularly severe about the left elbow region. Plaintiff described pain that radiated up from the elbow to the neck and down from the elbow to the fingers of the left hand. Dr. Rosenfeld diagnosed plaintiff as having a left ulnar neuropathy at the elbow based upon his clinical examination of plaintiff, even though the electromyography and nerve conduction velocity (NCV) test results of plaintiffs left upper extremity were within normal limits.
13. On 20 December 1995, Dr. Rosenfeld performed an ulnar nerve decompression. The operation revealed a thickened band traversing the ulnar groove, consistent with his diagnosis. Follow-up examinations on 22 December and 28 December 1995, and 25 January 1996, showed improvement, with some typical numbness in the ulnar distribution of the left arm. Plaintiff was still having some shoulder pain, but the pain from the elbow to the hand was improved.
14. Plaintiff was started on physical therapy and by 22 February 1996, plaintiff indicated a near complete resolution of the pain in her left elbow and the distal part of her left arm. Plaintiffs shoulder pain continued, however.
15. By 7 March 1996, plaintiffs left ulnar nerve function was normal and her ulnar neuropathy pain symptoms had resolved. Dr. Rosenfeld referred plaintiff to Dr. J. Alfred Moretz for an orthopedic evaluation of her shoulder.
16. Dr. Moretz diagnosed plaintiff with a multidirectional instability with possible secondary subluxated symptoms. He referred plaintiff to Dr. M. Timothy Fullam, a chiropractor. Dr. Fullams manipulations of plaintiffs shoulder provided significant improvement. Defendant refused to pay the cost of plaintiffs chiropractic treatment.
17. Dr. Rosenfeld was unable to provide any diagnosis for plaintiffs continuing shoulder pain, but did not believe she had thoracic outlet syndrome. On 5 July 1996, he gave plaintiff a final permanent partial disability rating of ten percent to her left arm, and referred her to Dr. Andrea Stutesman for physical rehabilitation.
18. Dr. Stutesman examined plaintiff once (at her initial visit), reviewed records of other physicians and concluded that plaintiff did not possess any of the four types of thoracic outlet syndrome and that plaintiff did not have reflex sympathetic dystrophy (RSD). She diagnosed plaintiff as having a right pectoralis minor syndrome due to posture problems, and left myofascial pain of the left scapular muscles. Plaintiff was given a TENS unit and later was switched to an RS-2 unit to control her pain. Plaintiff was also placed on a work-hardening program. Dr. Stutesman was unable to find any particular pattern to plaintiffs pain-causing movements and determined that the pain was psychological in origin. Dr. Stutesman later dropped plaintiff from her program, stating that plaintiff was in poor compliance and poorly motivated. Plaintiff had missed several sessions; however, plaintiff missed some days because of pain which prevented her from driving the 40 minutes to therapy and one day was missed due to drowsiness from medication. Plaintiffs pain increased as a result of the physical rehabilitation provided through Dr. Stutesman.
19. In January, 1997, plaintiff presented to thoracic and cardiovascular surgeon, Dr. William D. Lyday for evaluation and treatment. Dr. Lyday diagnosed plaintiff as having thoracic outlet syndrome and reflex sympathetic dystrophy, and recommended corrective surgery. Following his usual practice, he referred plaintiff to Dr. Dennis L. Hill, a neurologist on 16 January 1997 for a second opinion examination on whether plaintiff had thoracic outlet syndrome and whether surgery was warranted.
20. Dr. Hill agreed that plaintiff had left thoracic outlet syndrome and that she was a candidate for surgery. Dr. Hill is of the opinion that Dr. Lyday is one of the most experienced physicians in the nation in diagnosing and treating thoracic outlet syndrome. Dr. Hill also opined that physical therapy commonly makes thoracic outlet syndrome worse.
21. Dr. Lyday testified that, "thoracic outlet syndrome refers to a condition where the nerves that come from the spinal cord and supply the arm, hand, and fingers, primarily, have pressure exerted on them in what is known as the interscalene triangle in the neck, above the collarbone, which is the space between the anterior scalene muscle and the middle scalene muscles, that also have compression in the costoclavicular space, which is the space between the collarbone and the first rib. In many cases there is also an additional area of compression in the area of the pectoralis minor, plus the tendon which is inferior to the clavicle. Some people have prominent costocarocoid ligaments in that area, which also can exert compression, particularly on the vein. Thoracic outlet syndrome can occur spontaneously or can result from trauma.
22. Although defendant has admitted that plaintiff suffered an injury by accident resulting in left elbow strain on 12 April 1995, defendant denies that plaintiff suffers from thoracic outlet syndrome or that her injury caused her thoracic outlet syndrome.
23. There is some controversy in the medical community about whether thoracic outlet syndrome exists; however, Dr. Rosenfeld, Dr. Neimkin, Dr. Stutesman, Dr. Lyday and Dr. Hill, the majority of the doctors involved in plaintiffs care and treatment, believe that thoracic outlet syndrome is a medical condition which does exist. Also, there is medical literature which indicates that thoracic outlet syndrome can develop from trauma. Dr. Gregory Rosenfeld, a neurosurgeon who became board certified in May, 1996, opined that plaintiff did not have thoracic outlet syndrome. His expertise in the area, however, consisted of assisting with the treatment of one person with thoracic outlet syndrome during his residency. Dr. Andrea A. Stutesman, a physician specializing in physical medicine and rehabilitation, also did not believe plaintiff had thoracic outlet syndrome.
24. Dr. Dennis L. Hill, a board certified neurologist, was of the opinion that plaintiff had thoracic outlet syndrome; that there is no objective way to document whether plaintiffs stretching-type injury from work caused the thoracic outlet syndrome; but, based on his training, experience and evaluation of plaintiff and the history provided by plaintiff to doctors early on, plaintiffs thoracic outlet syndrome "could be associated with her injury. Dr. Hill appears to be using "could be to mean "possibly.
25. Dr. Ronald Demas, who is board certified in neurology and psychology, was of the opinion that plaintiffs electrodiagnostic test findings were compatible with bilateral thoracic outlet compression neuropathy.
26. Dr. Lyday, a board certified thoracic and cardiovascular surgeon since 1961, was of the opinion that plaintiffs thoracic outlet compression syndrome which he diagnosed 8 January 1997 was causally related to her traumatic (stretching-type) injury at work on 12 April 1995 and that plaintiffs reflex sympathetic dystrophy which he also diagnosed on 8 January 1997 was a complication of her thoracic outlet compression syndrome. The Full Commission accords more weight to the opinions of Dr. Lyday.
27. Dr. Lyday performed surgery on plaintiffs left side on 2 May 1997 consisting of decompression brachial plexus of the left thoracic outlet and left pectoralis minor muscle and tendon. At her follow-up visit on 27 May 1997, plaintiffs overall symptoms had improved and based on his physical examination, Dr. Lyday was of the opinion that plaintiffs decompression surgery on the left side was satisfactory. However, plaintiff was experiencing an increase in pain in the right upper extremity. Dr. Lyday opined that cross-symptomology is normal in cases of thoracic outlet syndrome. He recommended a brachial plexus decompression operation on the right side and referred plaintiff back to Dr. Hill for a second opinion. Dr. Hill agreed with Dr. Lydays diagnosis and recommendation for additional surgery.
28. As of 15 February 1997 when Dr. Lyday was deposed, the second surgery had not been performed. Plaintiff will not be at maximum medical improvement until all of her upper extremity problems have been treated appropriately. Plaintiff was not scheduled to receive a final rating from Dr. Lyday until after the second surgery and subsequent recovery period.
29. Plaintiff has developed thoracic outlet syndrome which was caused by her "stretching-type injury to her left upper extremity arising out of and in the course of her employment. Plaintiffs reflex sympathetic dystrophy developed as a direct and natural consequence of her thoracic outlet syndrome. The injury to plaintiffs left upper extremity was aggravated by the repetitive motion and overhead reaching involved in the light-duty work assigned by defendant after plaintiff returned to work following her injury.
30. As a result of plaintiffs admittedly compensable injury to her left upper extremity, her resulting surgeries, her physical restrictions and pain, plaintiff has been incapable of earning the same or greater wages in any employment since 7 July 1995.
31. Dr. Lyday has also diagnosed plaintiff with thoracic outlet compression of her right upper extremity with "cross-symptomatalogy or borrowing through the sympathetic nervous system from the left upper extremity. The Full Commission declines to rule at this time on whether plaintiffs right upper extremity problems are related to her compensable injury or whether the condition is disabling. At the time Dr. Lyday was deposed on 15 December 1997, he had not treated plaintiff since he sent her to Dr. Hill for a neurological consultation on 4 December 1997. Although Dr. Hill supported Dr. Lydays recommendation to proceed with right brachial plexus decompression, Dr. Hills examination indicated that plaintiff had fewer symptoms on the right compared to her left upper extremity. More evidence is needed to determine this issue.
32. Plaintiff has not reached maximum medical improvement.
33. The method of calculating plaintiffs average weekly wage is also disputed herein. Because plaintiffs employment with defendant-employer was for a period of less than fifty-two weeks prior to the date of her injury, method one cannot be used. Plaintiffs average weekly wage was calculated by defendant using a wage statement purported to be that of a person of the same grade and character employed in the same class of employment in the same locality or community as plaintiff, pursuant to N.C. Gen. Stat.97-2(5) (method three). The only evidence presented regarding the substituted employees work record showed that the employee did not work the same days, the same shift, or the same time as plaintiff. Further, the substituted employee earned significantly less in wages than did plaintiff during a comparable period of time, because plaintiff worked weekends and overtime at a higher wage.
34. The method which produces a result most fair to both parties as required by the statute is method two which requires that plaintiffs average weekly wage be calculated by dividing her earnings during the period of her employment by the number of weeks worked. Accordingly, plaintiffs average weekly wage is $670.11, yielding a compensation rate of $446.76 per week.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident to her left upper extremity on 12 April 1995 arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. 97-2(6).
2. As a result of the "stretching injury to her left upper extremity, plaintiff has developed left thoracic outlet syndrome and reflex sympathetic dystrophy which are also compensable.
3. As a result of her injury by accident and consequences flowing directly from the injury, plaintiff was temporarily totally disabled from 16 May 1995 to 7 June 1995, from 12 June 1995 to 25 June 1995 and from 7 July 1995 through the date of hearing before the Deputy Commissioner and continuing. N.C. Gen. Stat. 97-29.
4. Plaintiff is entitled to compensation at a rate of $446.76 based on her average weekly wage of $670.11. N.C. Gen. Stat. 97-2(5).
5. Defendants are obligated to pay all reasonable and necessary medical expenses incurred or to be incurred in the future by plaintiff as a result of her injury by accident, including the medical evaluations and/or treatment she has received from Doctors Larry Anderson; S. Andrew Deekens, Jr.; C. J. Dellinger; Donald C. Demas; M. Timothy Fullam; Dennis L. Hill; William D. Lyday; J. Alfred Moretz III, Ronald J. Neimkin; A. Gregory Rosenfeld; Allen O. Smith; and Andrea A. Stutesman.
6. The issue of whether plaintiffs right upper extremity problems are causally related to her compensable left upper extremity problems is reserved for subsequent determination. Plaintiff is not entitled to compensation for medical treatment for her right upper extremity problems until this issue is decided.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorneys fee hereinafter approved, defendant shall pay to plaintiff temporary total disability, compensation at a rate of $446.76 per week from 16 May 1995 to 7 June 1995, from 12 June 1995 to 25 June 1995 and from 7 July 1995 until further order of the Commission.
2. Defendant is allowed a credit for compensation previously paid to plaintiff from 16 May 1995 to 7 June 1995, from 12 June 1995 to 25 June 1995 and after 20 December 1995.
3. A reasonable attorneys fee of twenty-five percent of the compensation due plaintiff is hereby approved for plaintiffs counsel, payable as follows: twenty-five percent (25%) of all accrued compensation due plaintiff shall be deducted and paid directly to plaintiffs attorney; thereafter, plaintiffs attorney shall receive every fourth check.
4. Defendants shall pay all reasonable medical expenses incurred or to be incurred in the future by plaintiff when bills for such treatment have been approved through procedures adopted by the Commission, including the medical evaluations and/or treatment provided by Drs. Larry Anderson; S. Andrew Deekens, Jr.; C. J. Dellinger; Donald C. Demas; M. Timothy Fullam; Dennis L. Hill; William D. Lyday; J. Alfred Moretz III, Ronald J. Neimkin; A. Gregory Rosenfeld; Allen O. Smith; and Andrea A. Stutesman.
5. Defendants shall pay the costs due this Commission.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_______________ RENÉE C. RIGGSBEE COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
BSB:md